May it please the court. My name is Algernon Williams and I represent the petitioner in this matter. Your honor, basically what we're asking the court to hold is that in this particular case that this particular officer responded that his determination of probable cause was not in circumstances under a total fatality. This particular officer, give me a name. Mundy. Mr. Mundy. Okay. Officer Mundy. Yes. He was the lead investigator in this matter. If you got a case, it's against Mundy. I'm sorry? If you have a case, it's against Mundy. Am I right? Yes, correct. Your honor. But you also threw in all the arresting officers and everybody else. Less of a case against the arresting officer, we would concede that fact, your honor. Well, the arresting officers were complying with the court order. That is correct. They had a warrant. The officer doesn't have much choice once the court issues a warrant. They have to go execute it. It says you're commanded. We concede that fact, your honor. You go execute the warrant. I mean, I don't know how you're going to sue the arresting officer for going out and executing a warrant. We concede that we don't have much of a case against the arresting officer. Mundy's the fellow that went and got the warrant. That is correct, your honor. Your Honor, you're basically saying he misled the judge. Not that he misled the judge. Well, you are. You have to say he misled the judge. It wasn't probable. You're saying there's not probable cause. Well, if you want to say that he misled the judge, but what we're particularly arguing is that he gathered information and that his information as gathered would not lead to a determination of probable cause to a reasonably prudent or cautious, well-trained officer. Yes, but then the judge said there's probable cause and I issue a warrant. That is correct, your honor. And that got her arrested. The warrant got her arrested. Right. That means you're saying the officer should never have gone to the magistrate. Is that what it's called there in North Carolina? Correct, your honor. A magistrate. He never should have gone to him. Correct. What did they have? Well, your honor, what did they have is name, sex, and race. April Smith, black female. Well, they had a place, didn't they? A geographic location. They had a location. And it turned out that she was particularly 11 miles away from this particular location. There's nothing tying her. She was 11 miles away when? Well, she was, in his investigation, he determined that she lived 11 miles away at some time. There's no determination as to where she was on this particular date at all. What he did was he conducted a computer search. He found April Smith living in Iron Station, North Carolina, which turned out to be 11 miles away. Basically, the facts are there was an undercover buy that was done in March of 2009. Undercover bought crack cocaine, came back to Officer Mundy and said, black female, April Smith sold me crack cocaine. That was it. The officer, nine months later, in December, went to the magistrate and basically secured a warrant for April Smith's arrest. What we're arguing is that under the totality of the circumstances, this officer did not Is there anything else they had? No, Your Honor. That's in Lincolnton County? That is correct, Your Honor. Which is where? It is northwest, about less than an hour of Charlotte. Close to Lenore? Closer to Charlotte, Your Honor. Closer to Charlotte, from Lenore? Correct. South of there? Of Lenore? South of Lenore, northwest of Charlotte. What's the ... There's a city there that's got a baseball team they call the Crawdads. What's that one? Which one's that? I'm sorry. Say that again? There's a city there that's got a baseball team they call the Crawdads? I don't know exactly what that one is, Your Honor. It's on I-40. Yeah. Hickory? Hickory. Is this close to Hickory? It is close to Hickory, but it's still closer to ... Well, not closer to Charlotte. Closer to Hickory, but in between Charlotte and Hickory. Okay. But they said they went and researched April Smith's name, and they found three of them. Okay. Right? Well, I'm not sure exactly how many they found, but yeah, they found ... I thought the record said they found three, and two of the three were white, so they eliminated those. Okay. And I would say that's not a good elimination. Basically ... But they also said they had information that this informant said the woman was skinny. That is correct. Well, in his notes somewhere, not in his police report, but in his notes written, was skinny black female. Who wrote that down? Mundy. Mundy wrote she was a skinny black female, and you say when she was arrested, she weighed 166 pounds. And when they ... She said in an affidavit, it said she ... At that time, she weighed over 200 pounds. Correct. She was 160-something when she was arrested. I believe that is correct, Your Honor. And he knew at some point at the time of the drug buy, whoever bought that, was 169 pounds. I think he believed 130. I think the note said 130 pounds at the time of, I'm sorry, of the incident. That was what the CI said? I think that's what his note said, Your Honor. The CI didn't say ... But that was the same time as he wrote down skinny? Correct. Yeah. He did not write down ... The CI only said ... His only words were April Smith, black female. No other words of description of an April Smith. Well, where did the skinny come from? 130 pounds. I don't know where his description, other descriptions came from, Your Honor. It did not come from the CI. Judge Voorhees discussed this weight a lot in the context of this thing, in the significance or non-significance. Okay. And that is correct. Judge Voorhees discussed it as the only thing that we presented as a discrepancy in finding probable cause. We disagree with that. It's not that it was the only discrepancy. The only discrepancy or the argument is that the officer only had April Smith, black female. That was our main argument. Was there anything in the record that indicates that they knew that this, the subject, whoever she was, was from Lincolnton County? No, Your Honor. So nothing localized her at all? I'm sorry, there's nothing ... from what they had, correct? Not that I know of, Your Honor. The only thing, I guess, the computer system search, that he searched ... You don't have to go find stuff. I mean, the answer is no, isn't it? There was nothing else in the record to indicate there was something local about her. That is correct. And so that's basically what we're arguing. Did she have a ... actually, it was nine months. Is there any explanation for the nine-month delay? The only explanation that I can gather from ... is there any in the record from a nine-month delay? The investigation was ongoing. Is there ... Okay, go ahead. The investigation was ongoing. Correct. But there's nothing in the record to suggest that he took the picture and gave it to the informant and say, is that her, correct? That is correct.  When she was arrested, did she have the lawyer appointed? There was, Your Honor. And then she was put in jail and they kept her in jail for 80 days? That is correct. Why did they keep her in jail for 80 days? Did she ever ... She did not have the funds to ... Did she have a bond set? She did, Your Honor. But she couldn't make it? She couldn't make it. How much was it? I do not recall, Your Honor. Did the lawyer try to get her reduced or anything? I do not recall. And then they stepped in and dismissed the charge? That is correct. The prosecutor did? That is correct. Did he give an explanation for the dismissal of the charge? They did, Your Honor. And that explanation was that the defendant is unsure of her identity. That the what? Defendant. Well, the officer is unsure of April Smith's identity. The officer. Was that Mundy? Correct. That Mr. Mundy was unsure of the identity, so they weren't sure they had the right person? Correct. That's fair, what you would say is fair? Yes, Your Honor. But is there any explanation in the record of why they kept her in jail for 80 days when they didn't know who she was? No, Your Honor. There is no explanation in the record. She basically stayed in jail because she couldn't make bond. And was that a court event, that 80 days, it was a hearing date set and they came up and that was the answer or did someone come forward? Well, yes. She at some point did get released. And then basically after that point on their regular scheduling, at some point preparing for trial, they met with Mundy and at some point they determined that he wasn't sure of her identity. So after she was released, she was still under threat of trial? Yes. So it was beyond 80 days. And then after preparing for trial, someone finally said, we're not sure of Ms. Smith's identity? That is correct, Your Honor. So she ultimately made bond and released after 80 days? Correct, Your Honor. Okay. How much was the bond? I do not recall, Your Honor. Are you a retained counsel? No. Yes, Your Honor. You represented her in that case? No, Your Honor. I did not. But you're retained for the appeal? Correct. Why didn't I represent her in the underlying criminal charge? No, Your Honor. She had appointed counsel on that? I think she did, Your Honor. How long was it from her release until they dismissed it, said they weren't sure of the identity? Yeah, I think it was close to six months to a year, I think, Your Honor. Six months to a year later? Yes. And the prosecutor filed a paper that said the officer couldn't confirm her identity? That is correct, Your Honor. So six months to a year, she still was under the threat of a trial? That is correct, Your Honor. If my memory serves me correct. I read something in here, while she was in jail, she lost her job? That is correct. Is that properly in the record, or is that just something you stuck in here? I think that's properly in the complaint, so that's part of the record. I think that's in our complaint. Okay. Where was she working? I'm sorry? Where was she working? She was working at a factory. At a good job? I'm sorry? At a factory job? Yes, Your Honor. And she had, of course, had some issues prior and was very lucky and was doing pretty good in that particular job, Your Honor. See, they said, there's also in here that the officers knew that, in addition to what you said, that the officers knew that she had prior drug offenses? This is after they did the computer search and saw. But that was before they got the warrant? Correct. So at the time they sought the warrant, they knew not only she's a black female, her name was April Smith, and there was only one black April Smith that they could find in Lincolnton County. Correct. But that the April, some April Smith, had three prior offenses relating to illegal drugs. Correct. They say they had that, too. Okay. Well, I don't think they used that as, they had that information, but I think probable cause was already determined when he basically was found. Was that in the affidavit to the issuing magistrate? No, it's not. I don't think it's in his affidavit that that's what he used as his probable cause, the fact that she had priors. Okay. But you're basically, Your Honor. Is in the record, did he use a database other than the criminal record, criminal database to file a case? There is no record that he used any other database, Your Honor. Oh, okay. So he only looked for people who had records, under this record? Correct, Your Honor. And basically, as I indicated, it's basically name, sex, and race. April is a very popular name. Smith is a, probably the most popular name in the United States. There are a quarter million people with the last name of Smith. There are 2,600 people with the name, in the U.S., with the name April Smith. Do you know how many admin are in Charlotte area? Your Honor, roughly less than a hundred, well, less than 50, I think. Of April Smith? April Smith. In the Charlotte area? Correct. And well, Charlotte Metro, which includes, I would argue, includes Lincolnton, Rock Hill, Concord, all of those areas, which is 1.6 million people. How many April Smiths are there in that county? I'm sorry? How many April Smiths are there in that county? Your Honor, we don't know exactly how many in that county. We know that they found three. I thought they said there were three. There were three. And one of those, April Smith, was subsequently, even though she's white, was subsequently arrested for, in that same area, for drug offenses. I thought you said there was no evidence that he searched any database of any criminal records. Correct, there is. Well, how, we don't know how many April Smiths there were in the county. That would be counter-countable if it was a question asked of you. There's no evidence that, in this record, you tell me that he searched the population for April Smiths, that he searched the criminal records for April Smiths. Correct. Is that correct? Am I correct? That is correct, Your Honor. So the three, that limit is gone. That's not everybody in the county. Correct. All right. Thank you, Your Honor. All right. Thank you, Counsel. Mr. Flanagan? May it please the Court. My name is Pat Flanagan. I represent the appellees in this case, specifically Officers Mundy, McGinley, Green, Chief of Police Rodney Jordan, the City of Lincolnton, and the Lincoln Police Department. I think I previously reserved 15 minutes. My co-counsel, who represents the appellee, let's say it's here, has five minutes. So noted. Thank you, Your Honor. This case can be basically summed up in this way. Officer Mundy, on the date in question, and at the time he went and obtained the warrant from Magistrate Keene, had probable cause based on the totality of the circumstances, based on the facts that we've set forth in our brief. Can you tell us what the facts are? Yes, sir. That support, that he had to support probable cause? Yes, sir. On the date in question, which is March 10th, 2009. But the date in question is the date you said was the date you got the warrant, which was in December. Yes, sir. The warrant was obtained in December of 2009, but the date of the buy and the sell was March 10th, 2009. Right. He had a drug transaction in March 10th. Yes, sir. Rufus Lynch, who supplied an affidavit that's in the record, was the confidential informant who'd been used in the past by the City of Lincoln. By the way, this is not Lincoln County, but the City of Lincoln Police Department who are effectuating this arrest. What's the name of the county? There's a difference. It's Lincoln County. It's not Lincolnton. No, sir. It's Lincoln County. Lincolnton is the town? Yes, sir. Is that the county seat that he's in? That's the county seat, yes. All right. So I was calling Lincoln the county, and it's not. It's Lincoln County. That's right. It's the City of Lincoln or the Town of Lincoln. Is that where all the Unionists lived down there after the Civil War? They lived over in that area, and they named them after Abraham Lincoln? Some of them, Your Honor. Some of them. Okay. And it's about 15 miles from Hickory, where the Crawdads do reside. Okay. And it's, by the way, it's about 45 minutes, 45 miles from the City of Charlotte. And it's west of Statesville? Yes, sir. A little southwest of Statesville. In any event, Rufus Lynch was the confidential informant who the City had used many times before. They, on this date, met. They put an audio and a video on him. They supplied him with $60 in cash. He went to this location on Pine Street. He met up with a number of folks that are seen on the video. He also met up with the two folks who sold him four rocks of crack cocaine. First of all, Mr. Mayfield, who's set forth in the record, sold him two rocks of crack cocaine for $20 each. And Mr. Mayfield was also charged and a warrant was taken out for his arrest. And he subsequently pled guilty. In any event, in addition to Mr. Mayfield, Mr. Lynch bought two rocks of crack cocaine for $20 total, $10 each, from April Smith. He left the scene and went back and immediately was met with Officer Munday. Officer Munday searched him, found, you know, he had, of course, produced the rock cocaine. He identified Mr. Mayfield and April Smith as the people who supplied him with and sold him that crack cocaine. He knew them. He identified them to Officer Munday. And he identified, specifically talking about April Smith here, as an African-American female. Was Mayfield an eyewitness to the transaction with April Smith? Mayfield was present and also sold. Was he an eyewitness? I suppose he was. I don't know if that's in the record. And he pled guilty. You must know what he said, too, didn't you? None of that's in the record, Your Honor. So I don't know and I can't say what Mr. Mayfield said. Well, if it was favorable to you all, I expect you to put it in the record. Mr. Mayfield pled guilty to selling crack cocaine to Mr. Lynch. I understand. But there was no statements in the record that we are aware of that he made about Ms. Smith. Okay. In addition to identifying Ms. Smith, Officer Munday also ran a criminal history. And as the Court has pointed out, and only ran a criminal history, but as the Court has pointed out, identified three April Smiths in Lincoln County. And April Smith, the plaintiff, has a very significant criminal history of doing this exact same thing, possessing and selling cocaine dating back to the late 90s and throughout the 2000s. That record is in the record, Your Honor, in the Supplemental Joint Appendix. But it's essentially a list of those on the Supplemental Joint Appendix, page 38. That April Smith had three priors. Yes, sir. And when did Munday find this out? He found this out prior to... When? He did this when he was compiling his report, on the 10th of March of 2009. The 10th of March was the transaction. Yes, sir. The date of March was the transaction. Did he find that out on the 10th of March? I believe he did. He compiled his report on March 10th. You believe he did. Can you tell us that he found that out on the 10th of March? It's within his report, Your Honor, and his report... What's the date of the report? ...is dated March 10th, 2009. And how... what's the population of Lincoln County? About 10,000, Your Honor, is the city of Lincolnton. Lincoln County isn't much bigger. And all of the offenses, by the way, and all of the arrests of April Smith, except for one, were in Lincoln County. The other one is in Cleveland County, which is the adjoining county. And that's also reflected in the record. Based on that information... Now, you're talking about page 75 and after that of the supplemental JA? Well, on page 40... That's called a case report. Yes, sir. Is that what you're talking about? That's to the district attorney. Prior to that is his case report, which begins at the Joint Appendix 1. The first Joint... Yes, sir. The Joint Appendix itself? Yes, sir. No, I'm sorry. I'm sorry. The Supplemental Joint Appendix. The Supplemental Joint Appendix. And this, by the way... What page? These documents were attached to Officer Monday's affidavit. Your Honor... Which page? What page are you talking about? I was referring to page 38 of the Supplemental Joint Appendix, which shows all of the arrests and convictions within Lincoln County from 1993 through 2004, except for one in Cleveland County. Her name's not on there. Well, Your Honor, if you look, it's... That says... It's following... The page 37 is April Yvette Smith and 38 is the following page. So this all has to do with Smith, with Ms. Smith. And as you can see on page 39 again, April Yvette Smith is a pawn ticket dated August 16, 2008. But where does it show that that was generated on the 10th of March? Your Honor, it doesn't... You're investigating an offense of the 10th of March. Yes, sir. Right. If you look at the prior documents... Page 36? Yes, sir. Well, that's the arrest report. Yes, sir. Well, that was in December. There's a 10-March-09 on the bottom left-hand part of page 37. Right. Is that... And that's the same document. Is that indicate it was printed that date or where'd that date come from? That should indicate the print date. It says report name, offender, and information below that. And again, this is all compiled within Officer Munday's report. And Officer Munday indicated that he... Well, that shows your weight at 166 pounds. Yes, sir. It does. And that's... So, I mean, if you're right that that was generated on the 10th of March, then the officer knew on the 10th of March that the skinny black female weighed 166 pounds. Well, at least that is that information, not necessarily on the 10th of March. Well, that's usually when it's said it was the 10th of March. And let me address that point. The submissive weight, according to the documents, according to the records, varied a number of times. There are some, in the record, there are incidents where she weighed 166, 130, 213, and 141, and varied from height descriptions from 5'6 to 5'8. Which weight would make her skinny? Sorry? Which of those weights would make her skinny? You know, skinny is sort of a subjective term, I suppose, Your Honor. That's why I'm asking you. Yeah. I think at 5'8, 160, one might be skinny. At 5'8, 130, one might be skinny. At 5'8, 220, probably wouldn't be characterized as skinny. But there's no indication that the officers knew that she weighed 220 or really what her weight was at the time. Officer Monday's notes indicate skinny. It was his subjective determination that that meant 130, 5'6, 5'8. It might indicate that they got more than one person on the same record and got them all mixed up. I don't think so, Your Honor. Well, they've got people weighing different, you know, 100 pounds of difference. Well, it varies. Weight doesn't fluctuate that fast normally. Well, it's over a course of... It's over the illness or something. Yes, sir. Over the course of a number of years. I mean, this is from 1998 through 2004 through 2009 is this weight fluctuation. There's no indication that she weighed 220. First of all, the police report, the arrest report, indicates that she weighed 160 at the time of arrest, which was nine months later. I think the definitive part of this, Your Honor... Well, the arrest report says 166. Yes, sir. The arrest report. Yes, sir. That was nine months later. Nine months later. Yes, sir. And I think going back to what gives these officers probable cause to a specific... That's exactly what we want to know. Yes, sir. And it goes back to... He's sort of given up on everybody except Mundy. It sounded to me like... I mean, we may be able to ask him that when he gets back up here if he has. But if the only thing is Mundy, the question is what did he know about the person that was arrested, if anything, that constituted probable cause? I agree, Your Honor. And what he knew was that he had a confidential informant who had been used in the past and was reliable that specifically identified this April Smith as a person who sold him crack cocaine. He also had... I don't know that he had anybody that specifically identified this April Smith that came in later and said that when they dismissed it, they didn't know it was the right person. Well, which is not in the record. That's the whole question is whether it's this April Smith. Yes, sir. But first of all, the reasons for the dismissal are not in the record, I would add that. But again, it's not in the record, Your Honor. Do you contest it? I don't contest it was dismissed. It was dismissed by the district attorney... Do you contest why it was dismissed? For the reasons, I would, yes. You do contest why it was dismissed? Why it was dismissed. Why do you say it's dismissed? It was dismissed because, well, I can't speak for the district attorney, Your Honor, but I can't... Well, you're the only one we got. Yes, sir. And you're the lawyer for the state of North Carolina or for Mr. Mundy. Yes, sir. I know you're a private practice lawyer, but you're the lawyer that we got here. So we have to ask you the question. Yes, sir. And I understand. Again, as stated in our brief, the dismissal of the case by the district attorney is not dispositive of whether or not the police officers had probable cause to bring the arrest, bring the charges. We're not saying that. We're not saying that. That's just one of the facts that we have here. She was in jail for 80 days. Yes, sir. Which is, you know, jumps off the page of one of these cases that you arrest somebody and they don't get out on bond, they get in jail for 80 days, stuck in the system, lose their job, and then the case is dismissed. He's got a complaint. Does the complaint not say what he said? This is a 1983 case. He made allegations in the complaint. The complaint does say it. All right. Then the complaint says it. Well, and as the district court said, that's not... Right. Yes, sir. I understand. I think that, again, going back to what the officer knew at the time of the arrest and at the time he went and got the warrant certainly gives him rise to have probable cause to make this arrest based on the totality of circumstances which we've gone over. And I'm happy to answer any more questions if there are some. Thank you. Based on... That is the totality of circumstances? Yes, sir. It is the totality of circumstances. That the person that your confidential informant said he had purchased from was named April Smith. Correct? And he identified her as Miss April Smith. No. Yes, sir. He identified her... He identified her as April Smith. From what? African-American female. Oh, identified... No, he identified the person that he... that his inconfident person encountered. That person was April Smith, a black female. That's it. Correct? Correct. All right. And he hears the C.I. Yes, sir. The informant. And this is somebody that you had a relationship with. Not you, but Mr. Officer Mudden had a relationship with. They had used him in the past and he's been a reliable informant. And they knew where he was and where he would be available during that nine-month delay between the incident and the arrest, right? Correct? They may have been... Well, they should have. Yes. I mean, you can't have it both ways. You can't build yourself up, puff yourself up on he's reliable, that's a relationship, and then say, well, maybe not. But you knew where he was. You had a relationship. He's in the area, yes, sir. Right. But there's nothing in the record that said anybody ever said photographs, is that her? They did not do that. You're right. But let somebody stay in jail for 80 days and then face the threat of prosecution for another six months to a year. Is that right? And that is unfortunately what occurred, Your Honor. And they were unfortunate. But again, Your Honor, it goes back to did the officers have probable cause for the arrest? Not the conviction, not what happened. And it wasn't their decision after that, it is the decision of the district attorney. He didn't have any information that she resided or was from Lincoln County? Yes, sir. Iron Station. Where? What? It's in Lincoln County. The incident took place in Lincoln County. But April Smith, there was no indication that she was from Lincoln County other than that she was there on that time. But the only place you checked was Lincoln County. Yes, sir. And there was 50 or more, he says, in Charlotte. Well. I mean, I, well, see, these policemen and prosecutors get on TV over where I'm from, West Virginia, and they talk about everybody comes in bringing the drugs from Detroit and Cleveland and places like that and selling it. And they can be from anywhere. You got to get. She only checked, you know, she was the only black woman you could find in Lincoln County that was named April Smith, and she was arrested. That, that, yes, sir. They ran the criminal histories and she was the African-American woman named April Smith who had a prior history of selling and possessing drugs. And she had a prior, she had a prior criminal record. Yes. And she, and her name was April Smith and she lived in Lincoln County. That's right. And she was arrested. That's right. So basically, your, your, really Casey, you're saying because you have a prior criminal record, that gives you probable cause. It, it adds to it, Your Honor. It's a part of the totality of circumstances. That alone, I would agree, does not rise to the level. Well, because then you have the same name that's very common and I, I counsel said Smith is probably one of the most common names in America and April is a common name. That makes a difference? Your Honor, the information that they, I, I, I agree. April, April is a fairly common name. Smith certainly is a common name. But, but it, well, let me help you. Yes, sir. Tell me, a reasonable police officer, don't you think that, I mean, it seemed to me before you let somebody sit in jail for 80 days, you have somebody you have a relationship with and you don't just say under record, say, listen, we got a video. We have a record, person with a record, same name, and say, is that the person? Isn't that reasonable? Counsel, I mean, I know you got a representative side, but come on now, between us and the gate post, isn't that reasonable? I, I think that is, isn't that, I mean, common sense. I mean, you ask a 10-year-old child that, well, isn't that reasonable? It's certainly something that could have been done. Could have been? Why did I, should have been? Well, it's something that could have been done, but certainly, based on the information that he had at the time, using the confidential informant, the, the purchase of the drugs from both Mr. Mayfield and Mr. Smith and the information he had rises to the level of probable cause and the magistrate found... During the course of the investigation, was there any, was she ever interviewed, April Smith? She was not interviewed by the officer. During the course of the investigation, was this fellow Mayfield who was present, who, who pled guilty with the authorities who presumably cooperated, did he, was he ever interviewed? They were not interviewed because they were, were arrested and... Well, Mayfield pled guilty. He was your guy. With appointed counsel. So, there was no interview conducted. The, by the way, the, the basis, the reason for the delay in the, in the warrants being issued just for the, for your honors is when using a confidential informant, that's often the case that you don't arrest somebody right after... After he was arrested, after she was arrested, was Mayfield interviewed? No, sir. Neither of them... Was that the reason, was Mayfield interviewed and was that the reason the thing was dismissed? No, no, sir. There was, there was no interview of Mayfield or Smith after, either before or after the arrest. If that's all your honors have, I'd appreciate it and I would ask that the judgment from the district court be affirmed and the complaints against all the defendants be dismissed. Thank you. All right. Mr. Fennerelli? Another lawyer. Yeah, Fennerelli? Good morning, your honors. May it please the court. I think I can keep this brief. I'm here simply on behalf of Defendant LeSassier, who in an example of the gift that keeps on giving as part of an interagency cooperation was assisting the Lincolnton Police Department       Department of Justice and is a lawyer in the North Carolina Department of Justice and is a lawyer in the North Carolina Department of Justice and is a lawyer in the North Carolina Department of Justice  in the North Carolina Alcohol and Law Enforcement Division, a state agency not affiliated with Lincoln County directly. He's not an employee of Lincoln County, never has been an employee of Lincoln County. What he was faced with as was Defendant Green, who's Mr. Flanagan's client,    identifying April Smith with her driver's license number, her address, her social security number, her residence number, and her address and her address and her address and her residence number and her race and her gender. He executed that warrant based on its validity on its face. He arrested Ms. Smith in conjunction with Defendant Green and the process    the investigation, and ultimately I suppose the dismissal of the charges. of the investigation, and ultimately I suppose the dismissal of the charges. But as for Defendant LeSassier, he was faced with the information that's on the warrant. He was not involved in the investigation. He was not involved in the controlled by. He was not involved in any investigation that Detective Monday had done to obtain to apply to the warrant in the first place. He was just doing his job. Correct. He was just doing his job executing a warrant executing a warrant that on its face that on its face  signed by a magistrate, based on probable cause. based on probable cause. So since opposing counsel has not exactly conceded that he has no case that he has no case but he conceded but he conceded that he doesn't have much of a case against the arresting officers, unless your honors have questions, I think I've made the point I needed to make. Thank you, counsel. Thank you.   introduce the court introduce the court and just briefly and just briefly on just one point, Your Honor. on just one point, Your Honor. With regards to the confidential informant, we would argue that under the circumstances that this individual was not a  was not a reliable source in Mr. Mundy's affidavit, he specifically states that confidential informant had been used by other officers in his unit. in his unit. Never that he had any relationship with this individual that he could independently verify his reliability or anything to that extent. to that extent. He specifically quoted or put out by other officers never that he had any knowledge of his reliability or anything to that matter. So we would argue, Your Honor, in conclusion that based on the totality of the circumstances, the information that he had, the quantum, the quality that it does not read that a reasonable well-trained officer would not believe that he had probable cause to arrest a person. Are you willing to give up on everybody except Mundy? On the arresting officer but not the rest of them, Your Honor. Pardon? Only on the arresting officer. Only on the... The rest of the individual were a part of the investigation also, Your Honor. How... Why is... Why then... Why Mr. Mundy protected by the fact that he went to the magistrate and the magistrate found probable cause and issued a warrant? Why doesn't that give him protection? Because if the court finds that it was without probable cause then that protection goes away, Your Honor. The fact... Matter of fact that a warrant was issued by a magistrate doesn't basically protect them. You still have to get to the basic fact of whether or not in applying for that warrant he had probable cause. All right. Oh, whether a reasonable officer would have believed that he had probable cause. That's the question. Correct. Whether a reasonable, well-trained, cautious officer would have believed he had probable cause. All right. Thank you. Thank you. We'll come down. Thank you, Counsel. We'll come down, Greek Council, and then take a brief recess. This honorable court will take a brief recess.
judges: Roger L. Gregory, Robert B. King, G. Steven Agee